# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. _1:21-mj-03823 Goodman_

**UNITED STATES OF AMERICA,**

v

**MOHAMMAD ALI FAGHIHI,**
**FARZENEH MODARRESI, and**
**FAEZEH FAGHIHI,**
_____**Defendants.**_____/

FILED BY_____ ER _____ D.C.

**Sep 13, 2021**

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - Miami

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to August 9, 2013 (Mag. Judge Alicia Valle)?  ⁻ Yes   X   No

2. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard)? __ Yes   X   No

3. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss)?  ⁻ Yes   X   No

Respectfully submitted,

JUAN ANTONIO GONZALEZ
ACTING UNITED STATES ATTORNEY

By:  s/ Michael Thakur
MICHAEL THAKUR
Assistant United States Attorney
Court No. A5501474/
Florida Bar No. 1011456
99 Northeast 4th Street
Miami, Florida 33132-2111
Tel: (305) 961-9361
Email: Michael.Thakur@usdoj.gov

AO 91 (Rev. 08/09)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| MOHAMMAD ALI FAGHIHI, | ) |
| FARZENEH MODARRESI, | ) |
| and | ) |
| FAEZEH FAGHIHI, | ) |
| *Defendant(s)* | |

Case No. 1:21-mj-03823 Goodman

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____3/1/2016-9/12/2021_____ in the county of _____Miami-Dade_____ in the

_____Southern_____ District of _____Florida_____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1956(h) | Conspiracy to Launder Money |
| 50 U.S.C. § 1701 | Exported Goods or Technology to Iran without Authorization (M. Faghihi and Modaressi only) |
| 18 U.S.C. § 554 | Smuggling of Goods from the United States (M. Faghihi and Modaressi only) |
| 18 U.S.C. § 545 | Smuggling of Goods into the United States (M. Faghihi and F. Faghihi only) |
| 18 U.S.C. § 371 | Conspiracy to commit an offense |
| 18 U.S.C. § 1001 | False Statements (M. Faghihi and F. Faghihi only) |
| 18 U.S.C. § 1343 | Wire Fraud (M. Faghihi only) |

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Special Agent Brenton K. Moreau, FBI
*Printed name and title*

Attested t by the applicant in accordance with the requirements of Fed.R.Crim.P. 4.1 by Face Time.

Date:  ___09/12/2021___

_____
*Judge's signature*

City and state:  _____Miami, Florida_____

Honorable Jonathan Goodman, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A CRIMINAL COMPLAINT**

I, Brenton K. Moreau, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.        I make this affidavit in support of an application for a criminal complaint charging

MOHAMMAD ALI FAGHIHI ("FAGHIHI"), FARZENEH MODARRESI ("MODARESSI"),

and FAEZEH FAGHIHI ("F. FAGHIHI") with conspiracy to commit money laundering, in

violation of 18 U.S.C. § 1956(h), and conspiracy to defraud, or commit any offense, against the

United States, in violation of 18 U.S.C. § 371; FAGHIHI and MODARESSI with exporting goods

or technology to Iran without first obtaining authorization, in violation of 50 U.S.C. § 1701, *et seq.*

(the International Emergency Economic Powers Act); 31 C.F.R. Part 560 (the Iranian Transactions

and Sanctions Regulations), and smuggling goods from the United States, in violation of 18 U.S.C.

§ 554; FAGHIHI and F. FAGHIHI with smuggling goods into the United States, in violation of

18 U.S.C. § 545, and providing materially false statements to Federal officers, in violation of 18

U.S.C. § 1001; and FAGHIHI with wire fraud, in violation of 18 U.S.C. § 1343.

2.        I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have

been since January 2020.  During my employment as a Special Agent, I completed 18 weeks of

training at the FBI Academy in Quantico, Virginia, where I received formal training in

investigative techniques.  I am currently assigned to the FBI Miami Field Office where I am

assigned to a squad investigating counterintelligence matters.  Prior to joining the FBI, I was

employed as a police officer with the Fairfax County Police Department in Fairfax, Virginia for

approximately five years.  Through my training, experience, and interaction with other law

1

enforcement officers, I am familiar with the methods commonly employed by those engaged in import/export control violations.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show simply that there is sufficient probable cause to support this criminal complaint and does not set forth all of my knowledge about this matter.

## RELEVANT LAW AND REGULATIONS

### *IEEPA and the Iranian Transactions and Sanctions Regulations*

4. Under the International Emergency Economic Powers Act ("IEEPA"), Title 50, United States Code, Sections 1701-1707, the President of the United States was granted authority to deal with unusual and extraordinary threats to the national security, foreign policy, or economy of the United States. 50 U.S.C. § 1701(a). Pursuant to that authority, the President may declare a national emergency through Executive Orders that have the full force and effect of law. Among other things, IEEPA empowers the President to issue regulations governing exports from the United States.

5. It is a crime to willfully violate, attempt to violate, conspire to violate, or cause a violation of any order, license, regulation, or prohibition issued pursuant to IEEPA. 50 U.S.C. § 1705(a). Willful violations of IEEPA constitute criminal offenses, and carry a 20-year maximum term of imprisonment and up to a $1,000,000 fine. 50 U.S.C. § 1705(c).

6. On March 15, 1995, the President issued Executive Order 12,957, which found that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States," and declared a national emergency to deal with that threat. 60 Fed. Reg. 14,615 (Mar. 17, 1995). In two subsequent

2

Executive Orders in 1995 and 1997, the President clarified his original declaration of a national emergency.  *See* Exec. Order No. 13,059, 62 Fed. Reg. 44,531 (Aug. 21, 1997); Exec. Order No. 12,959, 60 Fed. Reg. 24,757 (May 9, 1995).  Since 1997, the President has continued the national emergency with respect to Iran and the 1995 and 1997 Executive Orders.  The most recent continuation of this national emergency was executed on March 5, 2021.  86 Fed. Reg. 13621 (Mar. 9, 2021).   Pursuant to this declared national emergency, the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") issued the Iranian Transactions and Sanctions Regulations ("ITSR").  31 C.F.R. Part 560.

7.     The ITSR generally prohibit any person from exporting or causing to be exported from the United States to Iran any goods or technology without having first obtained OFAC authorization. 31 C.F.R. §§ 560.203-.205.  The ITSR similarly prohibit conspiring, attempting, or causing in any way the unlicensed export of U.S. goods or technology to Iran, or engaging in a transaction to evade the provisions of the regulations.   31 C.F.R. § 560.203.  Specifically, absent permission from OFAC, the ITSR prohibits, among other things:

a.     The exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran, including the exportation, reexportation, sale, or supply of any goods, technology, or services to a person in a third country undertaken with knowledge or reason to know that such goods, technology, or services are intended specifically for supply, trans-shipment, or reexportation, directly or indirectly, to Iran or the Government of Iran (31 C.F.R. § 560.204);

b.      The reexportation from a third country, directly or indirectly, by a person other than a United States person, of any goods, technology, or services that have been exported from the United States, if:  (a) such reexportation is undertaken with knowledge or reason to know that the reexportation is intended specifically for Iran or the Government of Iran, and (b) the exportation of such goods, technology, or services, was subject to export license application requirements under any United States regulations (31 C.F.R. § 560.205); and

c.      Any transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions contained in the ITSR (31 C.F.R. § 560.203).

8.      These provisions of the ITSR were in effect at all times relevant to this complaint.

### Smuggling Goods into and from the United States

9.      Title 18, United States Code, Section 545, makes it a criminal offense for any person to fraudulently or knowingly import or bring into the United States, any merchandise contrary to law, or receive, conceal, buy, sell, or in any manner facilitate the transportation, concealment, or sale of such merchandise after importation, knowing the same to have been imported or brought into the United States contrary to law.

10.      Title 18, United States Code, Section 554, makes it a criminal offense for any person to fraudulently or knowingly export or send from the United States, any merchandise, article, or object contrary to any law or regulation of the United States.

11.      Title 49, Code of Federal Regulations, Part 173 sets forth regulations for travel with hazardous materials.  Part 173.4b in particular regulates air travel with non-infectious biological specimens.  In relevant part, it provides that:

4

Non-infectious specimens, such as specimens of mammals, birds, amphibians, reptiles, fish, insects and other invertebrates ... are not subject to the requirements of this subchapter provided the following packaging, marking and documentation provisions, as applicable, are met: (1) The specimens are ... (ii) Placed in vials or other rigid containers with no more than 30 mL of alcohol or alcohol solution. The containers are placed in a plastic bag that is heat-sealed; (2) The bagged specimens are placed in another plastic bag with sufficient absorbent material to absorb the entire liquid contents inside the primary receptacle. The outer plastic bag is then heat-sealed ... and (5) The outer package must be legibly marked "Scientific research specimens, 49 CFR 173.4b applies."

### False Statements

12.     Title 18, United States Code, Section 1001, makes it a criminal offense for any person to knowingly and willfully make any materially false, fictitious, or fraudulent statement or representation in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States.

### Wire Fraud

13.     Title 18, United States Code, Section 1343, makes it a crime for any person, "having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises," to "transmit or cause to be transmitted" in interstate or foreign commerce "any writings, signs, signals, pictures or sounds for the purposes of executing such scheme or artifice" and using wire, radio, or television communication as the means of transmission.

### Money Laundering

14.     Title 18, United States Code, Section 1956(a)(2)(A), criminalizes transporting, transmitting, or transferring, or attempting to transport, transmit, or transfer a monetary instrument or funds to a place in the United States from or through a place outside the United States with the intent to promote the carrying on of specified unlawful activity.  That same provision criminalizes

5

a conspiracy to violate Section 1956.  18 U.S.C. § 1956(h).  The term "specified unlawful activity,"

with respect to a financial transaction occurring in whole or in part in the United States, includes

violations involving items controlled pursuant to the IEEPA, 50 U.S.C. § 1701, *et seq.*  18 U.S.C.

§ 1956(c)(7)(B)(v).

### *Conspiracy*

15.     Title 18, United States Code, Section 371 makes it a crime for two or more people

to "conspire either to commit any offense against the United States, or to defraud the United

States."

### **RELEVANT ENTITIES**

16.     FAGHIHI was born in Iran in 1969 and was admitted to the United States in or

around 2005 under a J-1 nonimmigrant visa issued for educational exchange purposes.  From the

date of his entry to approximately 2013, FAGHIHI served as a scientist, including a period as the

Senior Staff Scientist, at the Department of Neuroscience at the Scripps Research Institute located

in Jupiter, Florida.  From approximately 2013 to approximately 2020, FAGHIHI was an Assistant

Professor at the Department of Psychiatry & Behavioral Sciences at the University of Miami,

Miller School of Medicine.  According to a biography found on the University of Miami website,

FAGHIHI received his medical doctorate (M.D.) degree in or around 1994 from Shiraz University

of Medical Sciences located in Shiraz, Iran.  He received his Ph.D. degree in Biomedical Sciences

in or around 2007 at the Karolinska Institute located in Stockholm, Sweden.  Additionally,

FAGHIHI was described as "an expert in the field of RNA genetics, interested in non-

coding RNA, particularly natural antisense transcripts and their involvement in neurological

disorders such as Alzheimer's disease, Parkinson's disease, Multiple Sclerosis and Fragile X

Syndrome."  According to records maintained by the U.S. Citizenship and Immigration Services

("USCIS"), FAGHIHI currently has an application pending for U.S. citizenship.  He currently resides in Miami, Florida.

17.     MODARRESI, FAGHIHI's spouse, was born in Iran in 1968 and was admitted to the United States in or around 2005 under the same educational exchange program due to being FAGHIHI's spouse.  According to USCIS records, MODARESSI also has an application pending for U.S. citizenship.  In the application, MODARESSI advised that she is also in the medical field and that she, like FAGHIHI, worked at the Scripps Institute and the University of Miami. She currently resides in Miami, Florida, with FAGHIHI.

18.     F. FAGHIHI, FAGHIHI's sister, was born in Iran in 1971 and came to the United States in or around 2011 under a DV-2 immigrant diversity visa.  She is a naturalized U.S. citizen. According to a previously denied B-2 nonimmigrant visa application with the U.S. Department of State on or about September 30, 2009, F. FAGHIHI listed her occupation as "OB GYN SURGEON." She currently resides in Miami, Florida.

19.     Express Gene LLC d/b/a Express Gene Molecular Diagnostics Laboratory ("Express Gene") is a diagnostic laboratory located in Palmetto Bay, Florida focused on genetic testing.  According to the State of Florida, Division of Corporations, Express Gene was incorporated in or around March 2016 by FAGHIHI's sister, with FAGHIHI listed as the registered agent, FAGHIHI and F. FAGHIHI listed as Title Managers, and MODARESSI listed as Title Authorized Member.

**<u>PROBABLE CAUSE</u>**

***FAGHIHI Attempted to Smuggle Vials into the U.S.***
***and Made False Statements to U.S. Law Enforcement***

20.     On February 20, 2021, FAGHIHI arrived at Miami International Airport located in Miami, Florida on Qatar Airlines flight #777 with travel originating from Shiraz, Iran.  Upon arrival, FAGHIHI was referred for a secondary inspection by U.S. Customs and Border Protection ("CBP").  As part of the inspection, CBP conducted an interview of FAGHIHI and examined his baggage and electronic media devices under CBP's border search authority.

21.     Upon retrieval of FAGHIHI's baggage, CBP officers obtained a verbal declaration from FAGHIHI wherein he claimed ownership of two large suitcases, a small carry-on, and all contents contained within.  As part of the declaration, FAGHIHI was asked if he had anything to declare.  FAGHIHI replied "No, only food."  During the examination of FAGHIHI's baggage, CBP officers discovered approximately seventeen (17) vials containing unknown biological substances covered with ice packs inside of a clear plastic bag.  Within the clear plastic bag, CBP officers observed a V-shaped plastic tube with the date "02/19/2021", the day prior to FAGHIHI's arrival to the U.S., written in pen.  Additionally, the vials were concealed beneath bread and other food items within one of FAGHIHI's suitcases.  A photograph of how the vials were packaged is provided below:



22.      When initially confronted with the package of vials CBP officers had found, FAGHIHI stated that the samples were nothing important and that they could be thrown away to avoid any problems.  FAGHIHI further advised that the biological materials were DNA samples given to him a week prior by a friend to bring to the United States in order to conduct testing to determine the probabilities of that individual developing cancer.  When questioned about the V-shaped plastic tube with the date "02/19/2021", FAGHIHI was unable to provide an answer. FAGHIHI admitted to CBP officers that he was not in possession of the proper document to be transporting these types of biological samples.

23.      FAGHIHI was subsequently asked by CBP officers how his friend obtained the purported DNA samples.  FAGHIHI replied that they were obtained from a doctor.  However, when questioned further, FAGHIHI could not provide the name of the doctor nor the location of the laboratory that the samples came from.

24.      During the interview, FAGHIHI stated that his purpose for the 12-day trip to Iran was to visit his sister whose husband he stated died recently from COVID-19. When asked how

often he travels to Iran, he claimed that he goes about once a year, when in fact, travel records indicate that FAGHIHI has traveled to Iran multiple times a year, with some stays lasting longer than four months.

25.     During the interview, FAGHIHI stated that he is currently employed by the University of Miami where he works as an Assistant Professor in the Psychiatry and Behavioral Sciences Department.  When questioned about his current trip to Iran, FAGHIHI denied having exercised his profession or involvement in any type of research in Iran.  Further, FAGHIHI stated that he has never practiced his profession in Iran or worked in a lab in Iran during any other trip. However, during the basic search of one of FAGHIHI's cellular telephones, CBP officers located a file that provided details regarding a laboratory within Shiraz University of Medical Science in Iran bearing his name: "Dr. Faghihi's Medical Genetic Center."  When confronted with this information, FAGHIHI explained that the laboratory was named after him as a sign of respect. Upon further questioning, FAGHIHI admitted that he is the director of the laboratory in Iran. When asked why he omitted this information, FAGHIHI stated that Shiraz University is part of the Iranian government and that could have led the CBP agents to believe he is involved with the Iranian government.

26.     During a basic search of one of FAGHIHI's cellular telephones, CBP officers located communications between FAGHIHI and laboratory staff in Iran, as well as a Shiraz University of Medical Sciences identification card indicating that FAGHIHI was an Assistant Professor in the Department of Medical Genetics.  A photograph of the identification card is provided below:

10



27.     CBP officers also asked FAGHIHI about his father and he replied at first that his father was a lawyer who had died when FAGHIHI was about 12 years old.  When CBP officers confronted FAGHIHI with a photo of his father holding images of an ayatollah from one of FAGHIHI's cellular telephones, FAGHIHI admitted that his father was an important figure in the Iranian revolution and that he had been assassinated in 1981.  FAGHIHI stated that he did not provide this information at first because he did not want to be linked to the Iranian government.

28.     On or about June 25, 2021, the FBI obtained a search warrant signed by U.S. Magistrate Judge Jacqueline Becerra to review the contents of the imaged phones. References in this Affidavit to the contents of electronic communication to or from FAGHIHI were obtained from those imaged phones, unless noted otherwise.

29.     The package of vials was detained by CBP to determine their admissibility into the United States.  These samples were thereafter provided to the FBI for testing.  According to the FBI Laboratory, the V-shaped plastic tube contained multiple samples of human DNA, contradicting FAGHIHI's statement to CBP that the samples were DNA for a single individual.

11

The other 16 vials appeared to contain read primer for genetic sequencing purchased from a company in California ("U.S. Company 1").

30.     According to U.S. Company 1 records, the 16 vials were purchased by Express Gene, FAGHIHI's laboratory, prior to FAGHIHI's travel to Iran.   This information directly contradicts FAGHIHI's statement to CBP officers that he received the vials from an unknown doctor or laboratory in Iran.

31.     Financial records also showed that in addition to the purchases from U.S. Company 1, Express Gene made purchases from several genetic sequencing equipment manufacturers including, among others, a company located in California ("U.S. Company 2").   Between March 28, 2018 and October 29, 2019, Express Gene spent approximately $916,600.96 on products from U.S. Company 2.   Further review of Express Gene's financial records show that Express Gene received international wire transfers between October 2016 and November 2020 totaling approximately $3,476,592.40.   The wire transfers originated from Turkey, China, Malaysia, Singapore, and the United Arab Emirates ("UAE"). Open source research of the companies sending the wires does not appear to show any clear purpose for the wires or any clear connection between the companies and genetic testing. The wires were likely utilized to fund a significant portion of the aforementioned equipment purchases, as well as the opening of Express Gene. In my training and experience, the amount and nature of those third-country international wires is indicative of money laundering designed to conceal that payment originated in Iran.

### FAGHIHI's Awareness of the Hazardous Materials Regulations

32.     According to records from the Centers for Disease Control and Prevention, Division of Select Agents and Toxins ("CDC"), FAGHIHI/Express Gene obtained a "Permit to Import Infectious Biological Agents, Infectious Substances, and Vectors" issued on or about

September 2, 2020, permitting the import of "HUMAN BODILY FLUIDS THAT MAY CONTAIN SEVERE ACUTE RESPIRATORY SYNDROME CORONAVIRUS 2 (SARS-COV-2) / COVID-19." According to the permit, FAGHIHI/Express Gene were only allowed to import samples from a cruise line located in Fort Lauderdale, Florida. As part of the conditions of issuance listed on the permit, the "PACKAGING MUST CONFORM TO 49 CFR SECTIONS 171-180." In pertinent part, the regulations require that the outer package be legibly marked "Scientific research specimens, 49 CFR 173.4b applies." None of the 17 vials that FAGHIHI attempted to transport into the United States on February 20, 2021, bore these markings, nor did the outer packaging that contained the 17 vials.

### FAGHIHI and MODARRESI Discussed Exporting and Smuggling Goods from the U.S to Iran

33.     WhatsApp messages found on FAGHIHI's electronic devices showed that FAGHIHI had illegally exported a genetic sequencing machine made by U.S. Company 2 from the U.S. to Iran in 2017. Specifically, the FBI located the below WhatsApp message exchange between FAGHIHI and MODARRESI that occurred on January 2, 2017 (messages translated from Farsi to English):[1]

> FAGHIHI: "I will get the work started, and then I will come"
>
> MODARRESI: "Which system?"
>
> MODARRESI: "It doesn't matter. Come whenever you think is the right time"

---

[1] The translations referenced in this Affidavit are preliminary translations provided by FBI linguists.

> *FAGHIHI: "(U.S. Company 2). I want to go to Bushehr* [a port city in Iran] *this*
>
> *week and try to release it"*
>
> The conversation continued:
>
> *FAGHIHI: "It was caught in customs. They tell me something different each day"*
>
> *FAGHIHI: "I will go to Bushehr on Wednesday. Hopefully it is not damaged by*
>
> *now"*

34.     On January 5, 2017, FAGHIHI confirmed to MODARRESI that he had the
machines and was taking them to Shiraz.

35.     Geolocation data collected from FAGHIHI's Apple iPhone 6 placed the phone in
Shiraz, Iran, on November 15, 2016, and January 11, 2017. According to travel records, FAGHIHI
departed the U.S. from Miami International Airport on November 3, 2016, and returned to the U.S.
on February 14, 2017.

36.     On January 12, 2017, in a WhatsApp conversation between FAGHIHI and
MODARRESI, FAGHIHI discussed having difficulty with the U.S. Company 2 device.
MODARRESI offered to send the remedy to fix the device (messages translated from Farsi to
English):

> *FAGHIHI: "It's giving me error because of the Flow Cell"*
>
> *MODARRESI: "Renew it, if it comes I'll send both"*
>
> The conversation continued:
>
> *FAGHIHI: "Find the Flow Cell and send it to me however you can. With regular*
>
> *mail"*
>
> *MODARRESI: "I'll try"*

37.     On May 2, 2017, FAGHIHI sent a WhatsApp message in Farsi to an Iranian phone number advising that his laboratory in Shiraz was ready for its grand opening. FAGHIHI further wrote that the laboratory included "two (U.S. Company 2) machines", "one Ion proton machine", and a "private server", and with the "assistance of the NIMAD Institute" (likely referring to the National Institute for Medical Research Development of the Islamic Republic of Iran, which uses the acronym NIMAD), the "Iranian Genome Project" has been initiated.  NIMAD is part of the Ministry of Health and Medical Education for Iran. On or about October 4, 2020, FAGHIHI sent an email to a high-ranking Iranian government official at the Ministry of Health asking support from the Iranian government for the purchase of specialty medical equipment and authorization to purchase foreign currency at the government rate. The Iranian government official responded that because of sanctions it was difficult to provide the foreign currency.

38.     On May 8, 2017, FAGHIHI sent a WhatsApp message in Farsi to a "professor" with an Iranian phone number advising that he had "purchased two (U.S. Company 2) devices" and "installed" them in Shiraz.

39.     Documents provided by U.S. Company 2 to the FBI showed that on September 10, 2016, a purchase order (PO EG-916-003) was initiated by FAGHIHI on behalf of Express Gene for the purchase of two genetic sequencing devices manufactured by U.S. Company 2. This occurred just weeks prior to the above conversations between FAGHIHI and his spouse.

40.     According to export documents from the Automated Export System (AES), a U.S. government database of electronic export information filed by shippers, an export was documented on behalf of Express Gene on November 3, 2016, the same day FAGHIHI departed the U.S.  The description of the commodity was "Industrial Robots" with a total shipping weight of 282 kilograms (kg) and a Point of Origin listed as Florida. The Ultimate Consignee was a company in

Dubai, United Arab Emirates. Express Gene financial documents do not show any international wire payments from the Dubai based company, indicating that the Dubai based company was likely acting as a freight forwarder.

41.     According to records provided by U.S. Company 2, the internet protocol (IP) addresses for the two aforementioned genetic sequencing machines sold to FAGHIHI showed the devices were located in Iran sometime between February 1, 2017 and November 28, 2017, and continued to show an IP address in Iran as recently as June 21, 2021.

42.     Records from U.S. Company 2 show that at least one other genetic sequencing machine, sent to FAGHIHI at Express Gene on or about August 19, 2019, had an IP address located in Iran between September 22, 2019 and October 4, 2019, and again on December 26, 2019.

43.     OFAC advised the FBI that the U.S. Company 2 machines required a license for export under the ITSR and that neither FAGHIHI nor Express Gene had been issued such a license.

44.     Further communication between FAGHIHI and MODARRESI show that they conspired to smuggle items out of the Unites States to Iran on other occasions, as shown in the examples below.

45.     On May 23, 2017, MODARRESI sent a WhatsApp message to FAGHIHI in Farsi asking whether anybody in Iran needed a specific kit or an RT PCR machine (used for genetic testing). MODARRESI indicated she needs money and wants to buy a machine and take it with her to Iran to sell.

46.     On June 28, 2018, MODARRESI sent a WhatsApp message to FAGHIHI in Farsi expressing concern that someone may report them for bringing the "machine", that they would then get in trouble, and that with sanctions getting more restrictive FAGHIHI needed to pay attention to the list of sanctions and sanctioned banks.

***FAGHIHI and MODARRESI Discuss U.S. Export Controls Regarding Iran***

47.     OFAC advised the FBI that FAGHIHI/Express Gene had previously applied for a specific license to export one of the U.S. Company 2 machines.  Specifically, on September 22, 2016, FAGHIHI submitted an application to OFAC requesting authorization to export a U.S. Company 2 genetic sequencing machine from the U.S. to a company located in Shiraz, Iran.  That Iranian company website has a section titled "About Us" entirely devoted to FAGHIHI's biography and lists FAGHIHI's Gmail email account at the bottom of the page.  On October 3, 2016, OFAC issued a "Returned Without Action" letter, which stated that FAGHIHI's license application on behalf of Express Gene was deficient due to missing information and, as a result, OFAC would be unable to process the application. OFAC indicated in its letter that the missing information included the full name of the parties involved in the export and their role, the end-user contact information, and the official export classification number for the item to be exported.

48.     On or about November 11, 2016, in a WhatsApp conversation (translated from Farsi), MODARRESI stated that they (in an apparent reference to OFAC) need the names of all individuals in the company, whether those individuals are affiliated with the Iranian Revolutionary Guard Corps ("IRGC") or included in U.S. sanctions, the list of equipment that they want to send, and the company that they have contracts with. FAGHIHI responded that he had sent that information before and can send again. MODARRESI responded that they needed "complete" information. In a WhatsApp message earlier that year, on or about January 3, 2016, MODARRESI had sent a message in Farsi to FAGHIHI that one of their associates was with the IRGC and that they needed to be cautious.

49.     On or about December 12, 2016, in a WhatsApp conversation (translated from Farsi), MODARRESI asks FAGHIHI where the invoice is from U.S. Company 1. FAGHIHI

17

responded that MODARRESI saw it when she went to the company for OFAC documents. MODARRESI then says she cannot remember where she put it and will look for it at home.

50.     Additionally, before traveling to a genetics conference in Iran in May 2018, FAGHIHI signed a University of Miami advisory memorandum acknowledging he would comply with U.S. export control laws and regulations, including the Iranian Transactions and Sanctions Regulations (31 C.F.R. Part 560) and the Export Administration Regulations (15 C.F.R. Parts 730 *et seq.*).

### *Wires Utilized to Fund Purchase of Equipment from U.S. Company 2*

51.     JP Morgan Chase bank records show that a business checking account was opened for Express Gene on September 9, 2016. The signature card for the account identified F. FAGHIHI as the account manager, and FAGHIHI as an authorized signer. The initial account balance was $126,687.00. On September 12, 2016 an outgoing wire transfer for $125,000 was sent from Express Gene business checking account to U.S. Company 2 for the payment of the above purchase order (PO EG-916-003). The remaining account balance after the wire transfer was approximately $1,652.00. On October 3, 2016 an incoming wire transfer was received by Express Gene for $29,980.00, making the new account balance $31,404.00. The wire originated in Turkey with no clear purpose for the payment. Three days later, two additional outgoing wire transfers totaling $18,136.46, were sent by Express Gene to U.S. Company 2 for two additional purchase orders (PO EG-916-004 & PO EG-916-006).

52.     Bank records also show that in August 2019, a company in Dubai, unrelated to any genetic research, sent three wires to the Express Gene bank account totaling approximately $769,916, less than two weeks before FAGHIHI received a genetic sequencing machine that he purchased from U.S. Company 2. That machine, as stated above, was likely exported to Iran within

a month after receipt because it had an IP address associated with Iran as early as September 22, 2019.

**Background on the National Institutes of Health and the Grant Application Process**

53.    The National Institutes of Health ("NIH"), as part of the Department of Health and Human Services ("HHS"), serves as the nation's leading medical research agency.  According to the NIH website (www.nih.gov), the NIH invests approximately $41.7 billion annually for medical research, with more than 80 percent of NIH funding being awarded to extramural research through approximately 50,000 competitive grants at more than 2,500 universities or other research institutions.

54.    Prior to being awarded an NIH grant, a principal investigator ("PI"), and key personnel, must submit a series of required applications to NIH for review and approval.  These applications include: (1) an initial application, (2) a "Just-In-Time" Report ("JIT"), and (3) an annual Research Performance Progress Report ("RPPR").  The initial application requests a "biographical sketch" of the PI and key personnel in order to obtain background information related to their employment history, research experience, honors, and affiliations.

55.    Section 2.3.6 of the NIH Grant Policy Statement ("GPS") requires a signature of an Authorized Organization Representative (AOR) on the application that confirms the organization's intent to comply with all applicable assurances and certifications in the application. Section 2.3.7.6 of the NIH GPS further requires a unique signature and dated assurance from the PI for each submitted application.  The assurances must contain the following certifications, "1) that the information submitted within the application is true, complete and accurate to the best of the [principal investigator]'s knowledge; 2) that any false, fictitious, or fraudulent statements or claims may subject the [principal investigator] to criminal, civil, or administrative penalties; and 3) that

19

the [principal investigator] agrees to accept responsibility for the scientific conduct of the project and to provide the required progress reports if a grant is awarded as a result of the application." Id.

56.     Due to NIH funding being highly sought after by universities and other research institutions, the application process and yearly updates via the RPPR is designed to allow the NIH to capture detailed information, such as financial conflicts of interest, that allows the NIH to examine all relevant information to better weigh a researcher's affiliations and other financial support before granting funds.  Because NIH grants are funded by federal income tax dollars, the aforementioned information is requested through regulations that are derived from the Code of Federal Regulations ("C.F.R.").

57.     In addition to the above disclosure requirements, section 4.1.10 of the NIH GPS requires all applicants and recipients to disclose all significant financial interests to the educational institution they are associated with as required by 42 C.F.R. 50, Subpart F.  Furthermore, "significant financial interests" include "the value of any remuneration received from [an entity] in the twelve months preceding the disclosure, when aggregated, exceeds $5,000.00. 42 C.F.R. § 50.603.

58.     Lastly, Section 8.1.2.6 of the NIH GPS requires all recipients to gain prior approval from the NIH for any absences from the project for any continuous time period of three months or more.  This allows the NIH to be made aware of any significant changes in the project and to evaluate if a change of the PI for the project is warranted.  This ensures the research project progresses appropriately after the NIH has awarded funds.

**FAGHIHI Fraudulently Obtained NIH Grants**

59.     On August 10, 2012, FAGHIHI submitted as principal investigator an initial application for NIH grant R01 NS081208. FAGHIHI titled his research request as "Antisense RNA

Mediated Epigenetic Regulation of Brain Derived Neurotrophic Factor". In general, FAGHIHI's research sought to study the role of non-coding RNAs which act as the epigenetic modulators of the BDNF expression. The project/performance site location was listed as the University of Miami ("UM") School of Medicine in Miami, Florida. The grant application requested a total of $1,912,500.00 of funding, however the NIH awarded 11 grants totaling $1,335,405 between 2013 and 2017. NIH awarded FAGHIHI his first grant on February 14, 2013, in the amount of $334,688, and his final two grants were issued on December 8, 2016 in the amount of $301,219, and on June 12, 2017, in the amount of $33,469.

60.     In 2016 and 2017, while conducting research funded by the NIH, and operating under the financial disclosure requirements set forth by 42 C.F.R. 50, Subpart F, Express Gene, FAGHIHI's South Florida laboratory, started receiving large deposits into the business bank account from international wires. The large deposits were not disclosed, as required, to UM[2] or to the NIH's Financial Conflict Of Interest Module through the electronic Research Administration (eRA) system. In fact, in 2017, FAGHIHI utilized UM's "U Disclose" system to electronically submit that he had no additional income to disclose. A chart of the international wires deposited into the business account of FAGHIHI's laboratory, Express Gene, during the mandatory disclosure period is provided below. According to open source documents, the Turkish company purports to focus on semi-finished metals, which is unrelated to any known business of FAGHIHI.

---

[2] 42 CFR § 50.604(e) requires that each "Investigator who is planning to participate in the [NIH]-funded research disclose to the Institution's designated official(s) the Investigator's significant financial interests (and those of the Investigator's spouse and dependent children) no later than the time of application for [NIH]-funded research" and to provide update disclosure within thirty days of discovering or acquiring new significant financial interest.

| Transaction Date | Transaction Type | Amount | Country |
|---|---|---|---|
| October 3, 2016 | Incoming Wire | $29,980 | Turkey |
| December 21, 2016 | Incoming Wire | $49,875 | Turkey |
| March 14, 2017 | Incoming Wire | $36,865 | Turkey |
| June 23, 2017 | Incoming Wire | $14,923 | Turkey |

61.     Per Section 8.1.2.6 of the NIH GPS, a PI for an NIH-funded project must obtain prior approval from the NIH before travelling outside of the United States for any continuous time period of three months or more.  From January of 2014 to February of 2015, FAGHIHI was out of the United States and, as required, had another individual assume the role as PI.  However, from November 3, 2016 to February 14, 2017 (102 consecutive days), FAGHIHI was out of the United States.  No NIH approval was obtained and there was no change in the PI position.  From April 23, 2017, to September 16, 2017 (145 consecutive days), FAGHIHI again did not receive prior NIH approval and did not step down from the PI position.

62.     MODARRESI expressed concern to FAGHIHI about his travel to Iran. In a message thread beginning on or about January 5, 2016, MODARRESI told FAGHIHI that a professor in Miami announced at a group meeting that FAGHIHI was in Iran. MODARRESI then said, in Farsi, that there could be "grave" "consequences" to his actions and that they needed to be cautious.

### F. FAGHIHI and FAGHIHI Discuss Covertly Moving Goods and Money

63.     WhatsApp messages obtained from FAGHIHI's cell phone, pursuant to a signed search warrant, showed multiple communications in Farsi between FAGHIHI and F. FAGHIHI

22

regarding the covert transportation of goods into and out of the United States and the movement of money into the United States through apparent shell companies. The below conversations were translated from Farsi to English unless otherwise noted.

64.     On or about January 31, 2019, FAGHIHI sent a WhatsApp message to F. FAGHIHI, asking if she found a "traveler going to Iran" and then offered to pay $1,000 dollars to the person if they accepted. F. FAGHIHI responded and advised that if FAGHIHI was willing to spend that much money he should "mail it" and that he could "send it to Muscat [Oman]" and "bring it from there," an apparent reference to smuggling an item from the U.S. to Iran through Oman.

65.     On or about May 12, 2019, F. FAGHIHI messaged FAGHIHI via WhatsApp about how to justify payments from countries like Malaysia. After discussing computer and electronic companies, F. FAGHIHI told FAGHIHI that they needed to "find something like that in Malaysia". FAGHIHI responded by saying they could claim that they sold sequencing software. F. FAGHIHI responded, "but we collect money from them, it looks stinky, don't you think we should consult with a lawyer". FAGHIHI responded, "A lawyer does not do illegal work and we have to explain everything". F. FAGHIHI then sent a message clarifying that they would just ask a lawyer about what to say, and not ask the lawyer to do anything for them. FAGHIHI responded in English, with an apparent explanation for how to justify money they received: "We have created a software program for sequencing data analysis and sold it to [two Malaysian companies] for further development". The two companies FAGHIHI mentioned were companies that sent wires from Malaysia to Express Gene's Wells Fargo account ending in #3509.

66.     Bank records show that F. FAGHIHI and MODARRESI's purchase of the property for the Express Gene lab on or about March 13, 2019 for $175,000, was funded in large part by

23

wires from Malaysia. On February 21, 2019, Express Gene's Wells Fargo account ending in #3509 received an incoming wire from Malaysia in the amount of $119,970. On February 22, 2019, an outgoing wire from the Express Gene bank account was sent to the title company for the property in the amount of $15,000. Between February 27, 2019, and February 28, 2019, three incoming wires totaling $392,168 originated in Malaysia and were received by Express Gene. Soon after, on March 4, 2019 and March 13, 2019, Express Gene sent two additional wires to the title company for $15,000 and for $125,000, respectively. Bank of America records received showed that on March 13, 2019, F. FAGHIHI's personal account ending in #3286 wired a payment to the title company in the amount of $21,395.98.

67.     On or about August 7, 2019, F. FAGHIHI messaged FAGHIHI via WhatsApp advising that "there are two tubes". FAGHIHI instructed F. FAGHIHI to send the tubes by "DHL or FedEx" to Express Gene (FAGHIHI provided the company name and address in English). FAGHIHI further instructed F. FAGHIHI to send the tubes with a few pieces of paper, to state that they are only "documents", to not mention the "samples", and to declare the value as zero. CBP shipping documents showed that on August 27, 2019, just 20 days after the above conversation, Express Gene received an international FedEx package from Oman. The package contents were declared by the sender to be "documents". The method of travel for the package was listed as "air", likely requiring the "samples" in the "tubes" to be properly packaged and labeled under 43 C.F.R. Part 173 (the Hazardous Materials Regulations). Travel documents obtained by the FBI confirm that F. FAGHIHI was out of the United States during the timeframe of the above conversation on August 7, 2019. F. FAGHIHI returned to the United States on or about August 15, 2019.

*Border Search of F. Faghihi*

68.     On August 1, 2021, F. FAGHIHI arrived at Miami International Airport located in Miami, Florida on Qatar Airlines flight #777 with the flight originating in Doha, Qatar. Upon arrival, F. FAGHIHI was referred for a secondary inspection by CBP. As part of the inspection, CBP conducted an interview of F. FAGHIHI and examined her baggage and her cell phone under CBP's border search authority.

69.     During the interview of F. FAGHIHI, CBP inquired about her place of employment and her position. F. FAGHIHI advised that she owned a portion of Express Gene and her brother, FAGHIHI, owned the remaining portion. She further advised that she oversaw the finances for Express Gene. When asked about the source of the funds for the lab, F. FAGHIHI advised she sold property in Iran so she could afford the payments to purchase the suite where Express Gene is currently located.  F. FAGHIHI made no mention of the aforementioned wires from Malaysia.

## CONCLUSION

70.     For all the reasons stated above, I respectfully submit that there is probable cause to believe that FAGHIHI, MODARRESI, and F. FAGHIHI committed conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h), and conspiracy to defraud, or commit an offense against the United States, in violation of 18 U.S.C. § 371; FAGHIHI and MODARESSI exported goods or technology to Iran without first obtaining authorization, in violation of 50 U.S.C. § 1701, et seq. (the International Emergency Economic Powers Act); 31 C.F.R. Part 560 (the Iranian Transactions and Sanctions Regulations), and smuggled goods from the United States, in violation of 18 U.S.C. § 554; FAGHIHI and F. FAGHIHI smuggled goods into the United States, in violation of 18 U.S.C. § 545, and provided materially false statements to Federal officers,

in violation of 18 U.S.C. § 1001; and FAGHIHI committed wire fraud, in violation of 18 U.S.C. § 1343.

71.     I declare under the penalty of perjury that the information provided above is true and correct.

Respectfully submitted,

Brenton K. Moreau
Special Agent
Federal Bureau of Investigation

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by Face Time this __12th__ day of September, 2021.

HON. JONATHAN GOODMAN
UNITED STATES MAGISTRATE JUDGE

26